

# NUMBER 13-20-00281-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

CITY OF CRAWFORD, TEXAS,                                          Appellant,

v.

DCDH DEVELOPMENT, LLC,                                           Appellee.

## On appeal from the 170th District Court
of McLennan County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Longoria**
**Memorandum Opinion by Justice Longoria**

In two issues that include multiple sub-issues, appellant City of Crawford, Texas (the City) challenges the trial court's denial of its plea to the jurisdiction in favor of appellee DCDH Development, LLC (DCDH).[1] We reverse and render in part, and remand in part.[2]

## I.    BACKGROUND

The following facts were derived from the pleadings and evidence admitted at the April 23, 2020 hearing on the City's plea to the jurisdiction that included city council meeting minutes, deposition testimony from former mayor Marilyn Judy (Mayor Judy) and three councilmembers, and affidavits from the city secretary and city attorney.

The City has a city council made up of five councilmembers and a mayor. In early 2018, David Cunningham and David Holy on behalf of DCDH approached Mayor Judy regarding the possibility of developing a residential subdivision on land located within the extraterritorial jurisdiction of the City (the Stuth Farms Subdivision). According to Mayor Judy, water supply was an issue that was discussed and needed to be resolved before the development could go forward.

In March of 2018, Mayor Judy, Johnny Tabor, the engineer on behalf of the City, Cunningham, Holy, and Monty Clark or Dana Reid, an engineer on behalf of DCDH, attended a preliminary meeting to discuss the possibility of developing the Stuth Farms Subdivision. During the meeting, a question was posed regarding whether the City had sufficient water to serve the Stuth Farms Subdivision. In her deposition, Mayor Judy

---

[1] This appeal was transferred to this Court from the Tenth Court of Appeals in Waco pursuant to a docket equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001.

[2] In its briefing, the City has stated its plea to the jurisdiction did not challenge, and this appeal does not address, DCDH's claims against the City for alleged violations of Texas Local Government Code Chapter 212 and 245 or for an alleged unconstitutional taking under the United States and Texas Constitutions. Thus, we do not address these claims in this memorandum opinion.

testified that Tabor confirmed that the City had sufficient water.

A few months later, in June of 2018, DCDH presented the City council with a general proposal for the subdivision that included language stating that the "Developers [a]gree to assist [the] City in [w]ater and [s]ewer infrastructure upgrades to provide services to the new subdivision up to $250,000[.]" The following month, the council approved a resolution related to the annexation of the subdivison and a development agreement. Specifically, Resolution 2018-5 states:

> [D]CDH . . . is the owner of certain land within the extra territorial [sic] jurisdiction of the City . . . ; and
>
> [D]CDH . . . wishes to subdivide said property; and
>
> [U]pon completion of the construction of the development[']s infrastructure[,] DCDH . . . desires said properties to be annexed into said City and receive City services;
>
> [N]ow be it resolved that upon completion of construction of infrastructure as well as full compliance with the City[']s] . . . subdivision requirements in its[] Subdivision Ordinance; the City . . . will annex said subdivision and provide City services to same.
>
> In the event developer chooses to develop in phases[,] the City will annex and provide services to each phase individually as it is completed in accordance with the Subdivision Ordinance.
>
> The foregoing is subject to the Developer executing a Development Agreement acceptable to the City which assures that all additional costs of extending services and serving the Development with utilities will be born [sic] by the Developer (mains, additional storage, pressurization, etc.)[.]

After concerns were raised that the City may not have an adequate water supply, the City began a water study sometime after July of 2018. Mayor Judy provided Tabor with information for the study. However, Tabor resigned and a replacement engineer was hired to complete the study. In October of 2018, DCDH contends that it submitted copies

3

of its preliminary plat and construction plans to the City, and paid certain costs for construction plans and plat reviews. The City purportedly annexed the Stuth Farms Subdivision a few months later.

In February of 2019, a council meeting was held and the minutes reflect that the "[c]ouncil would like a signed agreement verifying that up to $250,000 by developers is in place for improvements of our present water systems, if needed." Mayor Judy testified that she agreed to obtain a signed agreement from DCDH, and she believed she had the council's authority to do so. The Mayor then reached out to city attorney, Charles Buenger, who drafted an agreement. Buenger averred that:

> [I] asked Ms. Judy if the proposed agreement had been approved and authorized by the City Council and she conveyed to me that the agreement had been approved and authorized by the Council. As City Attorney for the City of Crawford, I only attend City Council meetings if asked to attend by a member of the City Council. I had not attended a City Council meeting during which the proposed agreement had been discussed much less approved or the Mayor authorized to sign such an agreement. However, based on Mayor Judy's representation to me that the agreement had been approved and authorized by the City Council, I assisted with the drafting and negotiation of a document which came to be known as the "City of Crawford Developer Agreement" (the "Developer Agreement"). It is my understanding that the Developer Agreement[] was executed by Mayor Judy and the owners of DCDH Development, LLC.
>
> I later acquired the knowledge that the Developer Agreement had not been properly approved or authorized by the City Council and thus that Mayor Judy had not been authorized to sign or enter into said Agreement on behalf of the City because no specific action or vote was taken to approve or authorize the Developer Agreement. If I had known that the Developer Agreement had not been approved or authorized by the City Council, I would have advised Mayor Judy that she did not have the proper authority to execute the Developer Agreement on behalf of the City.

The agreement is titled "City of Crawford Developer Agrement" (Developer Agreement) and dated March 6, 2019. Mayor Judy, Cunningham, and Holy signed the

4

agreement. On March 6, 2019, Mayor Judy emailed Cunningham and Holy giving them permission to begin construction. However, a few days later, Mayor Judy asked Holy to stop working because it was brought to her attention that work should not have been started before the final plat was approved, according to the City's subdivision ordinance.

In April of 2019, Holy sought and obtained approval for two variances from the subdivision ordinance. In May of 2019, at two separate council meetings, approval of the final plat was on the agenda, but approval was not obtained. That same month, the council authorized a third engineer to do another water study since there were concerns that the previous report was not accurate. DCDH contends that on December 9, 2019, the City produced another study stating that the City did not have enough water for the subdivision, thereby essentially "[ending] the project."

DCDH sued the City for breach of contract and promissory estoppel related to the Developer Agreement. DCDH twice amended its pleadings adding claims for negligent misrepresentation of existing facts, tortious interference with prospective contracts, breach of implied-in-fact contract, and seeking specific performance. The City filed a plea to the jurisdiction asserting governmental immunity. DCDH responded to the City's plea, and the City replied. On April 23, 2020, the trial court held a hearing on the City's plea, and denied it the same day.[3] The City now appeals. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(8) (permitting immediate appeal of an interlocutory order denying a plea

---

[3] Multiple exhibits were admitted during the hearing on the City's plea to the jurisdiction by agreement of the parties. After admission of the exhibits on the record, the parties agreed that the court reporter would not record the remainder of the hearing. There is no suggestion that any testimony was taken or any further evidence admitted during the remainder of the hearing. *Cf. Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 782 (Tex. 2005) ("What is clear is that a reporter's record is required only if evidence is introduced in open court; for nonevidentiary hearings, it is superfluous.").

to the jurisdiction by a governmental unit).

## II.     STANDARD OF REVIEW

A plea to the jurisdiction is a dilatory plea, the purpose of which is to defeat an action without regard to whether the claims asserted have merit. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). Subject matter jurisdiction is a question of law, and we review a trial court's ruling on a plea to the jurisdiction de novo. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004); *see also City of Port Isabel v. Meza*, No. 13-19-00070-CV, 2020 WL 3786249, at *2 (Tex. App.—Corpus Christi–Edinburg July 2, 2020, pet. denied) (mem. op.). Immunity is properly asserted in a plea to the jurisdiction since sovereign immunity deprives a trial court of jurisdiction. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 636 (Tex. 2012); *Miranda*, 133 S.W.3d at 225–26; *see also La Joya Indep. Sch. Dist. v. Trevino*, No. 13-17-00333-CV, 2019 WL 1487358, at *2 (Tex. App.—Corpus Christi–Edinburg Apr. 4, 2019, pet. dism'd) (mem. op.).

A plea may challenge whether the plaintiff has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the case. *Garcia*, 372 S.W.3d at 635. However, it can also challenge the existence of those very jurisdictional facts, and in those cases, the court can consider evidence as needed to resolve any dispute over those facts. *Id.* In those situations, a trial court's review of a plea mirrors that of a traditional summary judgment. *Id.* If the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea as a matter of law. *Miranda*, 133

6

S.W.3d at 228. We construe the pleadings liberally in favor of the pleader and look to the pleaders' intent. *Id.* at 226*.*

### III.    PROPRIETARY-GOVERNMENTAL DICHOTOMY

In its first issue, the City contends that the trial court erred in denying its plea to the jurisdiction because it was acting in its governmental capacity and therefore has immunity from suit as to DCDH's contract claims and immunity from suit and liability as to DCDH's tort claims.

### A.    Breach of Contract

The City argues that it is immune from DCDH's breach of contract claim because the nature and purpose of the alleged Developer Agreement was for the provision of water service, a statutorily listed governmental function, and as such, an analysis of the four factors under *Wasson Interests, Ltd. v. City of Jacksonville*, 559 S.W.3d 142 (Tex. 2018) (*Wasson II*) does not apply.[4]

DCDH responds that governmental immunity does not bar DCDH's breach of contract claim because the City was acting in a proprietary capacity during all of its functions related to the Developer Agreement, and an analysis under *Wasson II* is warranted. It further responds that after considering the *Wasson II* factors and facts of this case, the City's action in entering the Developer Agreement is proprietary in nature,

---

[4] The four factors are whether:

> (1) the City's act of entering into the [contract] was mandatory or discretionary, (2) the [contract was] intended to benefit the general public or the City's residents, (3) the City was acting on the State's behalf or its own behalf when it entered the [contract], and (4) the City's act of entering into the [contract] was sufficiently related to a governmental function to render the act governmental even if it would otherwise have been proprietary.

*Wasson Interests, Ltd. v. City of Jacksonville*, 559 S.W.3d 142, 150 (Tex. 2018).

and thus governmental immunity does not apply.

### 1.    Applicable Law

"Sovereign immunity and its counterpart, governmental immunity, exist to protect the State and its political subdivisions [such as, municipalities] from lawsuits and liability for money damages." *Mission Consol. Indep. Sch. Dist.*, 253 S.W.3d at 655. There are two components of governmental immunity: (1) immunity from liability, which bars enforcement of a judgment against a governmental entity; and (2) immunity from suit, which bars suit against the entity altogether. *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006).

In addressing whether a claim is barred by governmental immunity, we first determine whether immunity is applicable to the claim, and we then look to statutory law to see determine whether the Legislature has waived immunity. *Hays St. Bridge Restoration Grp. v. City of San Antonio*, 570 S.W.3d 697, 703 (Tex. 2019); *Wasson Interests, Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 435 (Tex. 2016) (*Wasson I*).

A municipal corporation exercises its broad powers through two different roles: proprietary and governmental. *Wasson II*, 559 S.W.3d at 146. "The governmental/proprietary dichotomy recognizes that immunity protects a governmental unit from suits based on its performance of a governmental function but not a proprietary function." *Wasson II*, 559 S.W.3d at 146. Generally, governmental functions consist of a municipality's activites "in the performance of purely governmental matters solely for the public benefit." *Id.* at 147 (citation and quotation omitted). By contrast, proprietary functions are those "performed by a city, in its discretion, primarily for the benefit of those

within the corporate limits of the municipality," and "not as an arm of the government." *Id.* The Legislature has defined and enumerated governmental and proprietary functions in § 101.0215 of the Texas Civil Practice and Remedies Code (part of the Texas Tort Claims Act or TTCA) for the purposes of determining whether immunity applies. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(a)-(b). In *Wasson I*, the Supreme Court of Texas determined that the dichotomy also applied to breach of contract claims and that courts should be guided by the definitions provided in the TTCA. *Wasson I*, 489 S.W.3d at 439.

The TTCA generally defines governmental functions as those "that are enjoined on a municipality by law and are given it by the state as part of the state's sovereignty, to be exercised by the municipality in the interest of the general public" and provides a non-exclusive list of thirty-six governmental functions. TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(a). The TTCA defines proprietary functions as those "that a municipality may, in its discretion, perform in the interest of the inhabitants of the municipality" and provides a non-exclusive list of three proprietary functions. *Id.* § 101.0215(b).

To determine whether governmental immunity applies to a breach-of-contract claim against a municipality, the proper inquiry is whether the municipality was engaged in a governmental or proprietary function when it entered the contract, not when it allegedly breached. *Wasson II*, 559 S.W.3d at 149. The focus belongs on the nature of the contract, not the nature of the breach. *Id.*

### 2. Analysis

Here, assuming the Developer Agreement was valid as DCDH contends in its live pleading, the City is obligated under the agreement to "[p]rovide continuous and adequate

water service to the Property [after proper completion and dedication of the Water System Extension to City,]" and "water and sewer service" is one of the specifically-enumerated governmental functions listed in the TTCA. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(a)(32); *M.E.N. Water Supply Corp. v. City of Corsicana*, 564 S.W.3d 474, 477–87 (Tex. App.—Waco 2018, pet. denied) (concluding that appellee was acting in its governmental capacity when it entered into contracts with the appellants for the sale of wholesale water to both residents and non-residents because appellees' sale of wholesale water to both fell under the "waterworks" or "water and sewer service" provisions of the TTCA); *see also McLennan Cnty. Water Control & Improvement Dist. #2 v. Geer*, No. 10-17-00399-CV, 2020 WL 4218085, at *3 (Tex. App.—Waco July 22, 2020, no pet.) (mem. op.) ("Even assuming that the governmental/proprietary function analysis applies to water districts, the Texas Tort Claims Act ('TTCA') specifically identifies water service as a governmental function.").

A finding that the City was acting in its governmental capacity is supported by the recitals in the Developer Agreement:

> WHEREAS, [DCDH] is engaged in developing that certain 126.049 acres of land in McLennan County, Texas, more particularly known as the Stuth Farms Subdivision, according to the Plat Records of McLennan County, Texas, said land being hereinafter referred to as the "Property", and,
>
> WHEREAS, City owns and operates a water system which supplies potable water for human consumption and other domestic uses to customers within its service area, and,
>
> WHEREAS, [DCDH] has requested City to provide such water service to the Property through an extension of City's water system, such extension being hereinafter referred to as "the Water System Extension[.]"

10

Additionally, several other provisions in the Developer Agreement are merely mechanisms to ultimately faciliate the City providing water, such as the construction of a water system extension and dedication or acquisition of easements necessary for construction of the water system extension. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(a)(32).

Thus, the City was acting in its governmental capacity when it entered into the Developer Agreement, and immunity applies to DCDH's breach of contract claim. *See M.E.N. Water Supply Corp*, 564 S.W.3d at 487 ("If the City's actions are listed as a governmental function under the TTCA, we have no discretion, regardless of the City's motives, to declare the actions as proprietary.").

## B. Promissory Estoppel and Implied-In-Fact Contract

The City argues it is entitled to immunity from DCDH's breach of implied-in-fact contract and promissory estoppel claims because those claims involve water service, annexation, and planning and platting which are governmental functions. DCDH responds that while the complained of actions may "touch on" certain governmental functions listed under the TTCA, they were discretionary because they were on the City's own behalf and for the City's own benefit. DCDH further responds that the City's actions were not "essential" to any enumerated governmental functions, and that an analysis under *Wasson II* reveals the complained-of actions are proprietary.

*Wasson I* extended the proprietary-governmental dichotomy to the contract-claims context. *See Wasson I*, 489 S.W.3d at 439 ("We therefore hold that the common-law distinction between governmental and proprietary acts—known as the proprietary-

11

governmental dichotomy—applies in the contract-claims context just as it does in the tort-claims context."); *Dallas/Fort Worth Int'l Airport Bd. v. Vizant Techs., LLC*, 565 S.W.3d 69, 72–74 (Tex. App.—Dallas 2017) (plaintiff sued for breach of contract, fraudulent inducement, fraud-in-the performance, promissory estoppel, and attorney's fees and appellate court applied proprietary-governmental dichotomy to determine governmental immunity applied), *rev'd in part on other grounds*, 576 S.W.3d 362 (Tex. 2019).

Here, with respect to its promissory estoppel claim, DCDH alleges that "[t]he City told [DCDH] that it had sufficient water, annexed [DCDH's] property, received thousands of dollars from [DCDH] to review plans and plats, entered into the Developer Agreement, and even stated in writing that [DCDH] could begin construction[.]" Additionally, DCDH alleges in its live pleading as it relates to its implied-in-fact contract claim that:

> [B]ased on the acts and conduct of the City and its officials, the facts and circumstances indicate the parties had a mutual intention to form a valid agreement. The terms of an agreement between the parties began immediately after the first meeting in March of 2018 and were carried forward through other acts such as the Annexation Resolution, the Annexation Ordinance, the Council's request for Mayor Judy to obtain a written Developer Agreement, the draft of the Agreement by the City Attorney, the execution of the Agreement by the City's 'duly authorized representative[,]' the City's discussion of the Agreement after it was executed, and the City's directive to [DCDH] to begin construction[.]

Because these complained-of actions fall within listed governmental functions under the TTCA—namely zoning, planning and plat approval, and water and sewer service—we conclude that the City was acting in its governmental capacity, and governmental immunity applies as to these claims. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 101.0215(a)(29) (zoning, planning, and plat approval); 101.0215(32) (water and sewer service); *M.E.N. Water Supply Corp*, 564 S.W.3d at 478 (implicitly declining to analyze

12

*Wasson II's* four factors after determining that City's action of the sale of wholesale water to both residents and non-residents fell under the "waterworks" or "water and sewer service" provision of the TTCA); *see also City of McKinney v. KLA Int'l Sports Mgmt., LLC*, No. 05-20-00659-CV, 2021 WL 389096, at *3 (Tex. App.—Dallas Feb. 4, 2021, no pet.) (mem. op.) ("In its brief, [appellant] relies on the four-factor test set out in *Wasson II* to support its argument that the City acted in its proprietary capacity. But, as this Court has previously determined, that test does not apply if the function is listed in the [TTCA]."). Therefore, we hold governmental immunity applies to DCDH's promissory estoppel and implied-in-fact contract claim. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(a).

## C. Negligent Misrepresentation of Existing Facts and Tortious Interference With Prospective Contracts

The City argues that it is entitled to immunity to suit and liability from DCDH's negligent misrepresentation and tortious interference with prospective contract claims because the City's alleged actions were conducted in connection with zoning, planning and plat approval, engineering functions, building codes and inspections, and water and sewer service, all of which are listed as governmental functions in the TTCA. DCDH responds that the City does not have immunity to suit or liability for DCDH's negligent mispresentation and tortious interference claim because the City was acting in its proprietary capacity. In particular, DCDH asserts that when the allegations and facts of DCDH's tort claims are analyzed in light of the dichotomy, the City's actions and functions in connection to its tort claims are proprietary in nature.

As previously stated, the TTCA applies to tort claims. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215; *see also Wasson II*, 489 S.W.3d at 439 ("[T]he common-law

13

distinction between governmental and proprietary acts—known as the proprietary-governmental dichotomy—applies in the tort-claims context . . . ."); *Tooke*, 197 S.W.3d at 342 ("A municipality is not immune from suit for torts committed in the performance of its proprietary functions, as it is for torts committed in the performance of its governmental functions."); *see also City of Boerne v. Vaughan*, No. 04-12-00177-CV, 2012 WL 2839889, at *2 (Tex. App.—San Antonio July 11, 2012, no pet.) (mem. op.) ("A governmental entity's liability for its tortious conduct often depends in part on whether the entity's conduct involved a proprietary or governmental function. When a municipality commits a tort while engaged in a proprietary function, it is liable to the same extent as a private entity or individual.").

Here, DCDH alleges in its live pleading for its negligent misrepresentation of existing facts claim that:

> [T]he City made numerous representations regarding its ability and willingness to permit [DCDH] to construct a Subdivision. Those representations began during the pre-development meeting with the City's engineer and continued through the execution of the Developer Agreement, and even included permission to start construction. These representations supplied false information to Plaintiff, which Plaintiff relied on in making financial decisions with respect to buying land and preparing to develop the Subdivision. The City—in representing that it could, and would, provide the Subdivision with water, approve plats and annexation—did not exercise reasonable care or competence in communicating this information[.]

DCDH alleges for its tortious interference claim that:

> [I]t is well-known that there is an immediate market for the sale of residential lots and finished homes in the City. Had Plaintiff been permitted to proceed with development of the Subdivision as agreed, Plaintiff would have, in reasonable probability, sold the 53 lots in Phase I. Various members on the Council (and thereby acting as the City) acted with a conscious desire to prevent Plaintiff's continued development of the Subdivision. The City's multiple misrepresentations regarding its ability and willingness to allow the

14

construction of the Subdivision, specifically including the provision of water, constitute conduct that is independently tortious and unlawful[.]

DCDH's allegations concern governmental functions because they directly involve water service and planning and plat approval which are listed as governmental functions in the TTCA. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 101.0215(a)(29), (32); *cf. City of Corpus Christi v. Absolute Indus.*, 120 S.W.3d 1, 4 (Tex. App.—Corpus Christi–Edinburg 2001, pet. denied) (holding the appellant's action to be proprietary after explaining that "[m]erely because [appellee's claim that the appellant 'intentionally interfered with the contract existing between [the parties] touches upon waste and disposal to this remote degree does not make this act a governmental function; and in light of the pleadings alleging that th[e] act was done on the [appellant's] part to avoid monetary loss"). Therefore, we hold governmental immunity applies to DCDH's negligent misrepresentation claim and tortious interference claims. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(a); *Tooke*, 197 S.W.3d at 342.

The City's first issue is sustained. Having determing that the City was acting in its governmental capacity and has immunity under the TTCA, we now turn to see if the City's immunity has been waived. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.0215(a).

## IV.    WAIVER OF IMMUNITY

In its second issue, the City contends that the trial court erred in denying its plea to the jurisdiction because DCDH failed to identify and establish a valid waiver of the City's immunity.

### A.    Breach of Contract

The City asserts that there is no waiver of its immunity because the Developer

Agreement does not fall within the definition of a "contract subject to this subchapter" in local government code chapter 271 since it was not properly executed on behalf of the City. *See* TEX. LOC. GOV'T CODE ANN. § 271.151. DCDH responds that the City waived its immunity under chapter 271 when Mayor Judy executed the Developer Agreement as the "authorized representative" of the City, and as an expression of the will of the City. *Id.*

However, as discussed below, since the Developer Agreement is not an agreement for "goods or services" to the City as required to invoke a waiver of its immunity, we need not address whether it was "properly executed". *See* TEX. LOC. GOV'T CODE ANN. §§ 271.151(2)(A), 271.152; *Rusk State. Hosp. v. Black*, 392 S.W.3d 88, 95 (Tex. 2012) (holding that if immunity is asserted on interlocutory appeal, section 51.014(a) does not preclude the appellate court from having to consider the issue at the outset to determine whether it has jurisdiction to address the merits); *see also Bauer v. City of Waco*, No. 10-19-00020-CV, 2020 WL 7253430, at *6 (Tex. App.—Waco Dec. 9, 2020, no pet.) (mem. op.) ("Sovereign immunity 'implicates' the trial court's subject-matter jurisdiction."); *Brownsville Indep. Sch. Dist. v. Rendon*, No. 13-17-00628-CV, 2018 WL 1755878, at *4 (Tex. App.—Corpus Christi–Edinburg Apr. 12, 2018, no pet.) (mem. op.) ("'[W]e are obligated to review sua sponte issues affecting jurisdiction.'") (quoting *M.O. Dental Lab v. Rape*, 139 S.W.3d 671, 673 (Tex. 2004) (per curiam)).

### 1. Applicable Law

Section 271.152 of the Texas Local Government Code provides a limited waiver of immunity for local government entities that enter into certain contracts. TEX. LOC. GOV'T

CODE ANN. § 271.152. It states:

> A local government entity that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this subchapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter.

*Id.*; *Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist. v. Tex. Political Subdivisions Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320, 327 (Tex. 2006). Only "written contract[s] stating the essential terms of an agreement for *providing goods or services to a local governmental entity* that are properly executed on behalf of the local governmental entity" are contracts subject to waiver under this provision. TEX. LOC. GOV'T CODE ANN. § 271.151(2)(A) (emphasis added). "Services" is a broad term and encompasses a wide array of activities. *Id.* § 271.151; *Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 839 (Tex. 2010); *Lubbock Cty. Water Control & Imp. Dist. v. Church & Akin, L.L.C.*, 442 S.W.3d 297, 305 (Tex. 2014). The services provided "need not be the primary purpose of the agreement." *Kirby Lake Dev., Ltd.*, 320 S.W.3d at 839. "But chapter 271 does not apply to a contract that provides only an 'indirect, attenuated' benefit to the local government." *San Antonio River Auth. v. Austin Bridge & Rd., L.P.*, 601 S.W.3d 616, 629 (Tex. 2020).

Section 271.152 will typically only apply to contracts in which the governmental entity agrees to pay the claimant for the goods or services the claimant agrees to provide to the governmental entity. *See* TEX. LOC. GOVT' CODE ANN. §§ 271.152–.153; *Lubbock Cty. Water Control & Imp. Dist.*, 442 S.W.3d at 304. We look to the language of the contract itself to determine whether the contract at issue is an agreement for providing

17

goods or services. *See City of San Antonio ex rel. San Antonio Water Sys. v. Campbellton Rd., Ltd.*, No. 04-20-00569-CV, 2022 WL 219005, at \*5 (Tex. App.—San Antonio Jan. 26, 2022, no pet. h.); *Town Park Ctr., LLC v. City of Sealy*, No. 01-19-00768-CV, 2021 WL 4994785, at \*9 (Tex. App.—Houston [1st Dist.] Oct. 28, 2021, no pet.) ("Courts must look beyond the title of a written contract to determine whether it satisfies the waiver requirements of Chapter 271."). When reviewing a contract, our primary goal is to determine the parties' true intentions as expressed in the instrument. *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015). "While a party may agree to provide goods or services in exchange for something other than payment, the absence of any agreement by the governmental entity to pay for goods or services may indicate that the claimant did not in fact agree to provide goods or services." *Lubbock Cty. Water Control & Imp. Dist.*, 442 S.W.3d at 305.

### 2. Analysis

Here, the central purpose of the Developer Agreement is the City's provision of water service to DCDH's property, the Stuth Farms Subdivision, not vice versa. *See M.E.N. Water Supply Corp.*, 564 S.W.3d at 490 ("[T]he 'central purpose' of the contracts between [appellee] and [appellants] is indisputably [appellee's] sale of wholesale water to the [appellants], not vice versa."); *see also Brazos River Auth. v. Brazos Elec. Power Co-op. Inc.*, No. 10-09-00403-CV, 2010 WL 2523438, at \*4 (Tex. App.—Waco June 23, 2010, pet. denied) (mem. op.) ("The P[ower] S[upply] C[ontract]'s 'central purpose' is indisputably the [appellant's] sale of hydroelectric power to [appellee], not vice-versa.").

18

Any services contemplated under the Developer Agreement by DCDH, such as the indemnity obligations,[5] are at best indirect or attenuated benefits to the City. *See M.E.N. Water Supply Corp.*, 564 S.W.3d at 490 (determining that the "services" allegedly provided by the appellants, including "[t]he construction of storage, pumping, and pressure maintenance or other facilities; . . . and agreeing to indemnify [the appellee] for any losses, damage, or liability caused by the negligence of the [appellants,]" to be, at best, indirect and attenuated benefits that do not result in a § 271.152 waiver); *see also Berkman v. City of Keene*, 311 S.W.3d 523, 527–28 (Tex. App.—Waco 2009, pet. denied) (op. on reh'g) (agreement to provide water and sewer services to property free of charge was not a contract subject to chapter 271 because "use of the property as a children's home" and "filing of an annexation petition for the property" were at "best 'indirect' or 'attenuated' benefits to the City"); *but see Byrdson Servs., LLC v. S. E. Tex. Reg'l Plan. Comm'n*, 516 S.W.3d 483, 486 (Tex. 2016) ("We do not decide whether the warranty and indemnity provisions, standing alone, would qualify as the provision of services to the Planning Commission for purposes of chapter 271."). Additionally, any services contemplated under the Developer Agreement by DCDH are, as mentioned above, merely mechanisms to faciliate the City providing water to the subdivision. *M.E.N. Water Supply Corp.*, 564 S.W.3d at 490 (holding appellants' claims for breach of contract against appellee did not come within § 271.151 waiver after reasoning in part that "[The] 'services'

---

[5] Section 3.b. and 5.a.8. of the Developer Agreement provide that:

Developer and contractor shall indemnify City and hold City harmless from claims of any nature arising from death, personal injury or property damage suffered by any person or entity during construction of the Water System Extension.

Developer shall indemnify City and hold City harmless from all of the foregoing costs.

19

mentioned by the [appellants] are merely actions that are necessary to facilitate the procurement of water by the [appellants] for their customers").

Moreover, the Developer Agreement does not require the City to purchase anything from DCDH. *See Lubbock Cty. Water Control & Imp. Dist.*, 442 S.W.3d at 305; *see also City of San Antonio ex rel. San Antonio Water Sys.*, 2022 WL 219005, at *6 (holding appellant's immunity not waived under chapter 271 after reasoning among other things that the contract at issue did not require appellant to purchase anything from appellee); *cf. Kirby Lake Dev., Ltd.*, 320 S.W.3d at 832–33, 839 (ultimately holding waiver of immunity under § 271.152 where contract at issue, titled "Sales Agreement and Lease of Facilities", called for the governmental authority to buy and the developer to sell all completed portions of water and sewer facilities). Indeed, the only monetary provisions under the Developer Agreement concern fees to be paid by the Developer associated with the water system extension,[6] "[p]ayment of . . . [a]ll standard rates, fees, and

---

[6] Section 5.a. and section 5.a.1-8. of the Developer Agreement provide that:

Developer shall pay all fees in accordance with Subdivion Ordinance 98-2, associated with the Water System Extension as a contribution in aid of construction, including without limitation the following:

1.     Engineering and design;
2.     Easement or right-of-way acquisition;
3.     Construction;
4.     Inspection;
5.     Attorney's Fees;
6.     Governmental or regulatory approvals required to lawfully provide service, and
7.     Required infrastructure upgrades up to $250,000. Required infrastructure upgrades shall be those approved by both parties. Such funds will only be used for improving infrastructure in and around the City reservoir for the purpose to insure a reliable/sustainable source of water for the Suth [sic] Farm [sic] Subdivision. The City shall expend only so much as is necessary to achieve that objective[.]

20

charges as reflected in the City's approved rates[][7] for the City's provision of water service to the subdivision, and reasonable inspection fees plus ten percent overhead charged by the City to inspect construction of the water system extension.[8] Also, any "[City] infrastructure upgrades" made with the potential funds contribution from DCDH of up to $250,000 directly benefits DCDH because the purpose behind the funds contribution as shown by the agreement's plain language is "[t]o insure a reliable/sustainable source of water for the Suth [sic] Farm [sic] Subdivision." *See City of San Antonio ex rel. San Antonio Water Sys.*, 2022 WL 219005, at *7 ("The purpose of the benefit of increased sewer service, as enunciated in the contract, was for the proposed developments."); *see also CHW-Lattas Creek, L.P. v. City of Alice*, 565 S.W.3d 779, 788 (Tex. App.—San Antonio 2018, pet. denied) ("Although [the developer] points to the actions it took in furtherance of the development, these actions were in furtherance of [the developer's] desire to develop its land and were not services provided to the City under the essential terms of the Development Agreement.").

Therefore, we conclude that the Developer Agreement is not an agreement for

---

[7] Section 6.a.1 of the Developer Agreement provides that:

After proper completion and dedication of the Water System Extension to [the] City, City shall provide continuous and adequate water service to the Property, subject to all duly adopted rules and regulations of [the] City and the payment of the following: All standard rates, fees and charges as reflected in [the] City's approved rates.

[8] Section 3.a of the Developer Agreement provides that:

The Water System Extension shall be constructed in accordance with the approved plans and specifications. City shall have the right to inspect all phases of the construction of the Water System Extension. Developer must give written notice to City of the date on which construction is scheduled to begin so that City may assign an inspector. City may charge reasonable inspection fees based on the actual costs of labor, travel and incidental expenses of the inspectors, plus 10% overhead.

providing goods or services to the City, and thus the City's immunity has not been waived under § 271.152. *See* TEX. LOC. GOV'T CODE ANN. § 271.152.

**B.     Promissory Estoppel and Implied-in-Fact Contract**

With regards to DCDH's promissory estoppel claim, the City contends that promissory estoppel falls outside the limited waiver in § 271.152 of the Texas Local Government Code. In regards to DCDH's implied-in-fact-contract claim, the City contends § 271.152's waiver only applies to a contract in writing and thus is inapplicable. DCDH responds that there is no need to establish waiver since governmental immunity does not apply.

As shown, DCDH's promissory estoppel claim and implied-in-fact claim are based on a series of alleged acts, both oral and in writing, by the City. DCDH alleges that the City's course of conduct is actionable. However, the Texas Supreme Court has rejected finding a waiver of immunity based on a course of conduct. *See Sharyland v. Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 414 (Tex. 2011) (rejecting an invitation to recognize a waiver-by-conduct exception in a breach of contract suit against a governmental entity); *see also Alternatives Unlimited, Inc. v. Raymondville Indep. Sch. Dist.*, No. 13-13-00363-CV, 2014 WL 3737973, at *6 (Tex. App.—Corpus Christi–Edinburg Mar. 20, 2014, no pet.) (mem. op.) (concluding that appellee did not waive governmental immunity by its conduct in light of *Sharyland* and the specific facts of the case). Lastly, DCDH has not directed us to any authority specifically waiving governmental immunity as to these claims. Instead, its pleading generally alleges waiver by asserting "Plaintiff's claims are not subject to a Plea to the Jurisdiction because the

22

City has waived immunity for the claims alleged herein." Accordingly, the City's governmental immunity to the promissory estoppel and implied contract claims has not been waived. *See Sharyland*, 354 S.W.3d at 414.[9]

## C. Negligent Misrepresentation and Tortious Interference with Prospective Contracts

The City argues with regard to DCDH's negligent misrepresentation and tortious interference claims that DCDH's allegations do not come within the TTCA's waiver of immunity under § 101.021. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.021. The City further asserts that immunity has not been waived for DCDH's tortious interference claim because it is an intentional tort. *See id.* § 101.057. In its response to the City's plea, DCDH took the position that, because there is no immunity in the first place, it is not necessary to examine waiver. On appeal, DCDH does not respond to the City's argument.

Governmental immunity under the TTCA is waived for two types of claims: (1) those involving property damage, personal injury, or death arising from an employee's operation or use of a motor-driven vehicle or equipment; and (2) those involving personal injury or death caused by a condition or use of tangible personal property or real property. Tex. Civ. Prac. & Rem. Code Ann. § 101.021.

A plain reading of DCDH's allegations underpinning its negligent misrepresentation and tortious interference claim, set forth above, shows that they do not relate to property damage, personal injury, or death arising from an employee's operation

---

[9] As part of the City's second issue, it also asserts that DCDH's alleged damages are not recoverable under § 271.153(a) of the Texas Local Government Code citing *Tooke v. City of Mexia*, 197 S.W.3d 325 (Tex. 2006). However, since we have determined the City's immunity has not been waived for DCDH's breach of contract claim, we do not reach the issue of recoverable damages. *See* Tex. R. App. P. 47.1; Tex. Loc. Gov't Code Ann. §§ 271.152; 271.151, 271.153.

23

or use of a motor-driven vehicle or equipment nor do they involve personal injury or death caused by a condition or use of tangible personal property or real property. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021. Additionally, DCDH has not directed us to a specific waiver of governmental immunity for these claims. Instead, its pleading generally alleges waiver by asserting "Plaintiff's claims are not subject to a Plea to the Jurisdiction because the City has waived immunity for the claims alleged herein."

Additionally, the allegations which make up DCDH's tortious interference with prospective contracts claim encompass intentional acts, and tortious interference with prospective contracts is an intentional tort. *See Exxon Corp. v. Allsup*, 808 S.W.2d 648, 659 (Tex. App.—Corpus Christi–Edinburg 1991, writ denied) ("Because tortious interference with prospective contracts or business relationships is an intentional tort, submission of this special issue was improper."). The TTCA does not waive immunity for intentional torts. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.057 ("This chapter does not apply to a claim . . . arising out of assault, battery, false imprisonment, or *any other intentional tort* . . . .") (emphasis added); *see also McLennan Cnty. Water Control & Improvement Dist.* #2, 2020 WL 4218085, at *3–4 (concluding trial court erred in denying appellant's plea as to appellee's claim for trespass and invasion of privacy because they are intentional torts).

Therefore, immunity has not been waived as it relates to the DCDH's claims for negligent misrepresentation of existing facts and tortious interference with prospective contracts claim. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.057; *see also McLennan County Water Control & Improvement Dist.* #2, 2020 WL 4218085, at *3–4. We sustain

24

the City's second issue.

## D.     Specific Performance

The City argues that DCDH has not pleaded an "adequate" claim that would support the equitable remedy of specific performance.[10] Specific performance is an equitable remedy that lies within the court's discretion to award whenever damages would be inadequate or could not possibly be established. *See Hays St. Bridge Restoration Group*, 570 S.W.3d at 707; *Tamuno Ifiesimama v. Haile*, 522 S.W.3d 675, 690 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) ("[S]pecific performance is not a separate cause of action; rather, it is an equitable remedy that may be awarded when a party breaches a contract.") (citing *Stafford v. S. Vanity Mag., Inc.*, 231 S.W.3d 530, 535 (Tex. App.—Dallas 2007, pet. denied)).

Here, DCDH's pleading states that "[i]f damages available to Plaintiff prove to be inadequate, then at the election of Plaintiff, Plantiff seeks the specific remedy of specific performance. Specific performance consists of the City being compelled to approve of the plats and honor the terms of the Developer Agreement." However, having concluded governmental immunity applies and has not been waived for DCDH's claims, we need not address DCDH's specific performance remedy. *See* TEX. R. APP. P. 47.1.

---

[10] DCDH responds that the City did not address specific performance at the trial court in its plea or reply. While the City did not address specific performance at the trial court level, the City is permitted to raise these arguments for the first time on appeal. *See Manbeck v. Austin Indep. Sch. Dist.*, 381 S.W.3d 528, 530 (Tex. 2012) ("[T]he defense of sovereign immunity from suit sufficiently implicates subject matter jurisdiction to conclude that the defense may be raised for the first time on appeal[.]").

### V. CONCLUSION

We reverse the trial court's judgment and render judgment in part dismissing DCDH's breach of contract claim, promissory estoppel claim, implied-in-fact-contract claim, negligent misrepresentation of existing facts claim, tortious interference with prospective clients claim, and specific performance remedy. We remand to the trial court for DCDH's remaining claims.

NORA L. LONGORIA
Justice

Delivered and filed on the
24th day of March, 2022.